In re Paul G. POMAINVILLE, Debtor.

Beverly Chapman, Plaintiff,

v.

Paul G. Pomainville, Defendant.

Bankruptcy No. 98–12302.
Adversary No. 98–1200.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

March 7, 2000.

Paul Lukey, Cincinnati, OH, for debtor.

E. Hanlin Bavely, Cincinnati, OH, trustee.

## MEMORANDUM OF DECISION

JEFFERY P. HOPKINS, Bankruptcy Judge.

The Plaintiff, Beverly Chapman, commenced this adversary proceeding on July 13, 1998, with the filing of a Complaint. By her Complaint, the Plaintiff seeks a judgment against the Defendant, Debtor Paul G. Pomainville, for damages and a finding that the alleged debt is nondischargeable under the authority of 11 U.S.C. § 523(a)(4). A trial of this proceeding was conducted on March 3, 1999.

### I

The Plaintiff and Defendant are equal owners of an Ohio corporation known as Dual Effort, Inc. Through the corporation, the parties operated a dry cleaning business known as Hyde Park East Cleaners. They purchased the business in November of 1995, each party contributing approximately $20,000.00 towards the endeavor. The parties had been living together for approximately five years prior to the formation of the corporation.

In addition to their capital contributions, the corporation obtained a $120,000.00 loan for the purpose of start-up capital. Both of the parties signed a promissory note for the repayment of this indebtedness, the Defendant as "president" of Dual Effort, Inc. and the Plaintiff as "vice president." The parties established a business checking account whereby either party could sign off on business checks. Initially, the Plaintiff took care of all of the record keeping. Within six months, in approximately April of 1996, the Defendant became concerned about the business' finances and demanded an accounting from the Plaintiff. This incident marked a transition in the business and personal relationships between the parties. The Plaintiff left the residence that she shared with the Defendant and lived at the business. The Defendant took control of the business' finances and delegated much of this work to an accountant while he worked a separate job in Middletown, Ohio. At some point in this process, the Defendant changed the checking account by removing the Plaintiff as a signatory. The Plaintiff testified that, at times, she could not obtain information about the business from the Defendant or the accountant. The Plaintiff felt as though the Defendant wanted her to work as an employee of the business with no rights of ownership. The Defendant testified that he did not exclude the Plaintiff from the business but attempted to get her to run it so that the corporation would not have to hire managers. The Plaintiff, in late August of 1996, left the business as a result of what she described as physical and emotional violence. Within days of her departure, the Plaintiff suffered a heart attack.

Sometime after the Plaintiff's departure, Ruth Baker began working as an employee at the business. She worked there every day for six or seven months until it closed. She also began living with the Defendant at this time. Eventually the couple got married, although they are no longer living together. Ms. Baker testified that the Defendant kept the receipts and cash from the business in a box in the back of his car when the business closed at the end of each day. She also testified that he kept a good deal of cash in a briefcase that he carried with him at all times. Although Ms. Baker could not state exactly how much cash was kept in the briefcase, she said that it was filled with rows and stacks of $50 and $100 bills. The Defendant

would often take money from his briefcase or the box in the car to pay for dinner for himself and Ms. Baker after the close of the business day. However, Ms. Baker was unable to say how much of the cash the Defendant applied toward personal expenditures.

At some unknown time, the main water line into the business ruptured and ruined the boiler. The business was insured by Nationwide Insurance. As a result of this loss and other property losses that the record does not detail, Nationwide Insurance issued six different checks to the corporation totaling $17,057.30. The Defendant did not deposit these funds into the corporate checking account. Instead, the funds were deposited into the Defendant's personal checking account or a savings account held jointly with his daughter. Ultimately, the business did not yield the profits that the parties had hoped for when they purchased it. The parties entered into negotiations regarding a sale of the business. Two or three possible deals were proposed, but the parties could not reach a final agreement. The business was eventually closed and the corporation is now worthless.

## II

The Plaintiff contends that the Defendant owes her a nondischargeable debt stemming from his "fraudulent acts." (Complaint at 2.) Specifically, the Complaint alleges that the Defendant: (1) "wrongfully excluded Plaintiff from the operation of [the dry cleaning] business"; and (2) "fraudulently concealed and/or misappropriated the assets of the corporation to his own use." (Complaint at 1–2.) The Plaintiff argues that the alleged debt is excepted from discharge under the authority of 11 U.S.C. § 523(a)(4), which provides in material part:

A discharge under section 727 … of this title does not discharge an individual debtor from any debt—

. . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]

Exceptions to discharge are to be strictly construed against the creditor, *Manufacturer's Hanover Trust Co. v. Ward (In re Ward)*, 857 F.2d 1082, 1083 (6th Cir.1988), who bears the burden of proving nondischargeability under § 523(a) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### A. Fraud Or Defalcation

The Plaintiff contends that the Defendant's actions constitute fraud or defalcation while acting in a fiduciary capacity. To prevail under the fraud or defalcation provision of § 523(a)(4), the Plaintiff must prove: (1) the existence of an express trust status to the property at issue; (2) the Defendant was acting in a fiduciary capacity; and (3) the alleged debt arose from the Defendant's fraud or defalcation while acting in the fiduciary capacity. *See Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.)*, 760 F.2d 121, 124 (6th Cir.1985); *PaineWebber Inc. v. Magisano (In re Magisano)*, 228 B.R. 187, 190–91 (Bankr. S.D.Ohio 1998) (Calhoun, J.). To determine whether an express trust giving rise to a fiduciary duty was created, courts must look to state law. *Interstate Agency*, 760 F.2d at 124.

Under Ohio law, "[a]n express trust is 'a fiduciary relationship with respect to property, arising as a result of a manifestation of an intention to create it and subjecting the person in whom the title is vested to equitable duties to deal with it for the benefit of others.'" *Gabel v. Richley*, 101 Ohio App.3d 356, 362–63, 655 N.E.2d 773, 778 (Ct.App.1995) (quoting 5 Scott on Trusts § 462.1, at 310 (4th ed.1967)). The record in this proceeding establishes that no such express trust was created with respect to the property at issue. Specifically, the property at issue is the proceeds from the corporation's insur-

ance claims. These proceeds represent the only damages that the Plaintiff was able to quantify at trial.[1] Although she presented some proof of the Defendant's misappropriation of cash receipts that he kept in his briefcase and in a box in his car, the record does not contain any evidence of the amount of these funds misappropriated for the Defendant's personal use. With respect to the insurance proceeds, the record is clear that the Defendant misappropriated funds conveyed to the corporation through six insurance checks totaling $17,057.30. However, these insurance proceeds never served as the corpus of an express trust under Ohio law.

Illustrative of this point is the *Gabel* decision. In 1970, a corporation known as American Properties, Inc. purchased a twenty-acre parcel of real estate. Each time annual installment payments were made upon the debt incurred to purchase the property, the corporation would deed a portion of the property in three equal shares to the three shareholders of the corporation. When one of the shareholders, Rodney R. Richley ("Richley"), was having difficulty making his portion of the annual installment, he entered into a partnership with James Gabel ("Gabel") to share in Richley's one-third investment in the property. Specifically, Richley and Gabel agreed to make equal annual payments toward Richley's share of the corporate debt incurred to purchase the property and share the net profits arising from

the eventual sale of Richley's interest in the property. Notwithstanding his partnership with Gabel, Richley was still unable to make his annual payment to the corporation. As a result, Richley entered into a partnership agreement with Dale Ravenscraft ("Ravenscraft") similar to the agreement between Richley and Gabel. Although Gabel and Ravenscraft were aware of the corporation's involvement in the real estate transaction, neither of them were aware of Richley's partnership agreement with the other. Thereafter, Richley made his annual payment to the corporation from the funds contributed by Gabel and Ravenscraft without contributing any of his own funds. In 1978, one of the houses on the property was destroyed by fire. As a result, Richley received $14,504.00 in insurance proceeds. Neither Gabel nor Ravenscraft were aware of the property loss or the insurance proceeds. Ten years later, Gabel and Ravenscraft learned about the other's involvement with Richley. When confronted, Richley agreed to transfer his entire interest in the property to Gabel and Ravenscraft. Four years later, Gabel and Ravenscraft learned of the 1978 property loss and the insurance proceeds paid to Richley. When Richley refused to tender the proceeds, Gabel and Ravenscraft initiated suit to recover the same under the theory of implied trust.

The trial court ruled in favor of Richley, finding that although a resulting trust existed with respect to the real estate no such trust existed with respect to the in-

---

1. The Complaint only prays for "[a]n award of damages" without stating the amount thereof. In her case in chief, the Plaintiff failed to elicit proof of any specific dollar amounts other than the insurance proceeds. Following the close of the Plaintiff's case in chief, the Court finally asked the Plaintiff what she thought her damages were. She testified that she would like the Defendant to be responsible for the entire outstanding balance on the promissory note signed by the parties for the purpose of obtaining the $120,000.00 start-up loan. The Court finds this request to be incomprehensible. In a dischargeability action, a plaintiff must prove that the debtor owes the plaintiff a debt and

the debt falls within one of the exceptions to discharge. The Court does not see how either party's obligation on the start-up loan constitutes a debt to the other party absent an allegation of fraud in inducing the other party to obligate himself or herself on the loan. Although the Plaintiff has alleged fraud, she has never suggested that the Defendant fraudulently induced her to sign the promissory note. Absent such circumstances, both parties are liable on the note to the lender alone. Because the Defendant is not obligated to the Plaintiff on the promissory note, the outstanding balance on the same cannot serve as a debt owed by the Defendant to the Plaintiff that is potentially nondischargeable.

surance proceeds. The appellate court affirmed. Relevant to this proceeding, the appellate court began its analysis by noting the distinction between implied and express trusts. Significantly, the appellate court found that there was no express trust created with respect to the insurance proceeds. *Gabel,* 101 Ohio App.3d at 363, 655 N.E.2d at 778. Although the court did not elaborate upon its reasoning in support of this finding because the parties themselves conceded the same, the finding appears to have been premised upon the absence of intent by the parties to create a fiduciary relationship with respect to the insurance proceeds given that Gabel and Ravenscraft did not even know about the property loss and the insurance proceeds until fourteen years after the fact.

■■■■ Similarly, in this proceeding there is no evidence in the record that the Plaintiff and the Defendant intended to create a fiduciary relationship concerning the insurance proceeds. Like *Gabel,* there is no proof in the record that the Plaintiff even knew of the insurance proceeds until after they were received by the Defendant. The Sixth Circuit, elaborating upon the express trust requirement set forth in *Interstate Agency,* has stated that "§ 523(a)(4) is limited to only those situations involving an express or technical trust relationship *arising from placement of a specific res in the hands of the debtor.*" *R.E. America, Inc. v. Garver (In re Garver),* 116 F.3d 176, 180 (6th Cir.1997) (emphasis added); *see also Magisano,* 228

B.R. at 191 ("The existence of an express trust requires a clearly defined trust res, an unambiguous trust relationship, and specific, affirmative duties undertaken by a trustee."). In this proceeding, similar to *Gabel,* there is no proof that the Plaintiff placed her corporate share of the insurance proceeds in the hands of the Defendant under an express agreement that he deal with the same for the benefit of the Plaintiff. Absent such an express trust, an action for fraud or defalcation does not arise under § 523(a)(4) even if there otherwise exists a fiduciary relationship between the parties that is recognized by state law.[2] *Garver,* 116 F.3d at 178 (noting that the Sixth Circuit follows those courts that hold to a narrow construction of the term "fiduciary capacity" under § 523(a)(4) that does not necessarily include all fiduciary relationships recognized under state law).

**B. EMBEZZLEMENT OR LARCENY**

■■■■ Although the Plaintiff limited her Complaint and post-trial brief to the issue of fraud or defalcation while acting in a fiduciary capacity, embezzlement and larceny are also grounds for nondischargeability pursuant to § 523(a)(4). Embezzlement and larceny, unlike fraud and defalcation, do not require the existence of a fiduciary relationship. *See Magisano,* 228 B.R. at 190. Embezzlement, for purposes of § 523(a)(4), is "'the fraudulent appropriation of property by a person to whom such property has been entrusted or into

---

**2.** Although the existence of a fiduciary capacity for purposes of § 523(a)(4) is defined by federal law, state law is relevant to the issue. *Ohio Cas. Ins. Co. v. Kern (In re Kern),* 98 B.R. 321, 323 n. 2 (Bankr.S.D.Ohio 1989) (Cole, J.). The Plaintiff relies upon *Crosby v. Beam,* 47 Ohio St.3d 105, 548 N.E.2d 217 (1989) and *McLaughlin v. Beeghly,* 84 Ohio App.3d 502, 617 N.E.2d 703 (Ct.App.1992) for the proposition that a 50% shareholder owes a fiduciary duty to a fellow 50% shareholder under Ohio law. This assertion is questionable, at best, given that both of the plaintiffs in these cases owned less than 50% of the corporate stock and the courts found a fiduciary duty owed to a minority shareholder by a

controlling shareholder in a closely held corporation. Notwithstanding, there is Ohio case law in support of the proposition that an individual who is a 50% shareholder owes a fiduciary duty to a fellow 50% shareholder in a closely held corporation where the former, in addition to his or her capacity as shareholder, is also involved in the daily operations of the business as an officer and director. *See Prodan v. Hemeyer,* 80 Ohio App.3d 735, 610 N.E.2d 600 (Ct.App.1992). However, because there is no evidence of an express trust in this proceeding, the Court need not resolve the issue of whether the Defendant owed a fiduciary duty to the Plaintiff.

whose hands it has lawfully come.'" *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172–73 (6th Cir.1996) (quoting *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr.M.D.Tenn.1982)). Embezzlement differs from larceny in that the debtor's original acquisition of possession of the property was lawful. *Consumer United Ins. Co. v. Bustamante (In re Bustamante)*, 239 B.R. 770, 777 (Bankr.N.D.Ohio 1999). As noted earlier, the only quantified proof of damages in this proceeding relates to the Defendant's misappropriation of the insurance proceeds. Because there is no proof that the Defendant's initial possession of these proceeds was unlawful, larceny is inapplicable to this proceeding.

 To prevail on the basis of embezzlement under the authority of § 523(a)(4), the Plaintiff must prove: (1) she entrusted her property to the Defendant; (2) the Defendant appropriated the property for a use other than that for which it was entrusted; and (3) the circumstances indicate fraud. *See Brady*, 101 F.3d at 1173. Although there is ample evidence in the record to support the second and third elements, the first element presents a problem. Specifically, the insurance proceeds were the property of Dual Effort, Inc. and not the Plaintiff.[3] Moreover, the proceeds were entrusted to the Defendant, in his capacity as an officer of the corporation, by Dual Effort, Inc. and not the Plaintiff. Under these circumstances, any damages and related judgment of nondischargeability for embezzlement pursuant to § 523(a)(4) run to the corporation and not the shareholder. *See Ferraro v. Phillips (In re Phillips)*, 185 B.R. 121 (Bankr.E.D.N.Y.1995).

In *Phillips*, the plaintiff ("Ferraro"), a 50% shareholder of a corporation known as Advertising Services Plus, Inc. ("Advertising Plus"), commenced an adversary proceeding against the debtor ("Phillips"), a fellow 50% shareholder, pursuant to

§ 523(a)(2) and (4). Ferraro brought the action both individually and as a shareholder of Advertising Plus. In addition to Phillips, Ferraro also sued Advertising Plus as co-defendant. The record established that Phillips, designated as the president and treasurer of Advertising Plus, was responsible for the daily business affairs of the corporation while Ferraro, designated as vice president and secretary, primarily engaged in client relations and advertising production. Over a six-year period, Phillips took excessive salaries, misappropriated corporate funds for personal use and fraudulently induced Ferraro to extend credit to the corporation and execute a personal guarantee. Specifically, Phillips controlled the books of the corporation and provided Ferraro and accountants with as little information as necessary. When Phillips did provide information to these individuals, it was often inaccurate. Relying upon false information provided by Phillips through the corporation's accountant, Ferraro signed a personal guarantee for a lease of certain computer equipment and borrowed $10,000.00 and loaned the funds to the corporation. At the same time, Phillips took excessive salaries that exceeded his shareholder agreement with Ferraro and disguised $172,120.07 in personal expenditures as corporate expenditures. As a result of corporate cash flow problems related to Phillips' misappropriations, Ferraro had to use $41,740.13 of his own funds to satisfy the obligations on the $10,000.00 loan and the corporate lease. With respect to these damages, the court entered a nondischargeable judgment in favor of Ferraro. With respect to Phillips' misappropriations of corporate funds, the court entered a judgment in favor of Advertising Plus in the amount of $388,508.07.

 Unlike *Phillips*, there is no evidence in this proceeding that the Plaintiff expended any of her personal funds as a

---

**3.** The Plaintiff herself admits in the Complaint that the Defendant "misappropriated the *assets of the corporation* to his own use." (Complaint at 2 (emphasis added).)

result of the Defendant's conduct allegedly justifying nondischargeability.[4] Instead, the damages cited by the Plaintiff are no different from the damages incurred by Advertising Plus, not Ferraro individually, as a result of Phillips' misappropriations concerning salary and expenses. Under these circumstances, creditors of a corporation could be prejudiced if courts were to permit a shareholder to prosecute a direct action as opposed to a derivative suit. *Phillips,* 185 B.R. at 127–28 (where judgment to shareholder could impair the rights of creditors whose claims may be superior to that of the shareholder, derivative suit ensures equitable distribution).[5] As a result, the Plaintiff, in her individual capacity, is not entitled to a judgment pursuant to § 523(a)(4) for the Defendant's alleged embezzlement. *See Florida Outdoor Equipment, Inc. v. Tomlinson (In re Tomlinson),* 220 B.R. 134, 136 (Bankr. M.D.Fla.1998) ("An embezzlement claim requires a showing that the property, allegedly embezzled by the defendant, was the property of the plaintiff.").

### III

Strictly construing the exceptions to discharge as required by law, the Court finds no basis for relief for the Plaintiff under the authority of § 523(a)(4). Accordingly,

4. The Plaintiff notes that because of the Defendant's bankruptcy she is now solely responsible for repayment of the $120,000.00 loan. However, there is no proof that the Plaintiff obligated herself on the promissory note as a result of conduct by the Defendant justifying nondischargeability. In *Phillips,* on the other hand, Ferraro loaned $10,000.00 to the corporation and executed a personal guarantee solely because of fraudulent financial information about the corporation provided by Phillips. Moreover, *Phillips* is distinct to the extent that Ferraro sought relief pursuant to 11 U.S.C. § 523(a)(2) for fraudulent misrepresentation. To the extent that any relief was accorded to Ferraro, as opposed to the corporation, pursuant to § 523(a)(4), such relief cannot be had in jurisdictions that require proof of an express trust between the parties. *See O'Shea v. Frain,* No. 98 C 5651, 1999 WL 1269352, at *5 (N.D.Ill.Dec.22, 1999).

5. Even if the Court were to assume that the Plaintiff intended to commence this proceed-

the Complaint filed by the Plaintiff on July 13, 1998, will be **DISMISSED.** An order to this effect will be entered.

ing as a derivative action and obtain a judgment for the corporation as opposed to herself individually, the Plaintiff has failed to do so in accordance with the applicable rules of procedure. "Shareholder's derivative actions are governed by Rule 23.1 of the Federal Rules of Civil Procedure." *Brown v. Ferro Corp.,* 763 F.2d 798, 802–03 (6th Cir.1985), *cert. denied,* 474 U.S. 947, 106 S.Ct. 344, 88 L.Ed.2d 291 (1985). Under this rule, "[t]he corporation is a necessary party to the action; without it the case cannot proceed." *Ross v. Bernhard,* 396 U.S. 531, 538, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). In *Phillips,* the court had no trouble entering a judgment in favor of the corporation because Ferraro commenced the suit in his capacity as a shareholder as well as individually and he brought suit against the corporation as well as the debtor. The Plaintiff did not do so in this proceeding.